# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

ALDENE MORRISON, *as Trustee for Heirs and Next-of-Kin of Anthony May, Jr., deceased*,

                    Plaintiff,

v.

BELTRAMI COUNTY; SHERIFF PHIL HODAPP, *individually and in his capacity as Beltrami County Sheriff*; ANDREW RICHARDS, SAUL GARZA, ADAM OLSON, and KATHERINE O'BRYAN, *individually and in their capacities as Beltrami County Jail Correctional Officers*,

                    Defendants.

Civil No. 19-1107 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Vincent J. Moccio, **BENNEROTTE & ASSOCIATES PA**, 3085 Justice Way, Suite 200, Eagan, MN 55121, for plaintiff.

Stephanie A. Angolkar and Jason M. Hiveley, **IVERSON REUVERS CONDON**, 9321 South Ensign Avenue, Bloomington, MN 55438, for defendants.

Anthony May, Jr. died of sudden cardiac arrest while in pretrial detention at the Beltrami County Jail. His mother, Plaintiff Aldene Morrison, brings this § 1983 action against the four corrections officers who were on duty the night of May's death, asserting claims for failure to provide adequate medical care and failure to protect from general harm, and against Beltrami County and the Beltrami County Sheriff, asserting municipal

liability for an unconstitutional custom and failure to train. At the heart of the matter is a dispute about the constitutional adequacy of the Beltrami County Jail's inmate well-being check practices. Defendants have filed a Motion for Summary Judgment on all claims asserted in the First Amended Complaint.

Because the record shows no violation of May's right to adequate medical care and because whether deficient well-being checks violate an inmate's right to protection from general harm is not clearly established as a matter of law, the four corrections officers are entitled to qualified immunity. Further, Morrison has not shown how the record supports a reasonable inference that Beltrami County Jail was deliberately indifferent to an unconstitutional custom. However, the record does support a reasonable inference that the Beltrami County Jail was deliberately indifferent to inmates' rights when it implemented its training regimen on well-being checks; thus, a genuine dispute of material fact remains as to Beltrami County's alleged failure to train. The Court will therefore deny Defendants' Motion as to Count V against Beltrami County and grant the Motion as to Counts I through IV.

BACKGROUND

I.      FACTS

   A.      May's Pretrial Detention and Death at Beltrami County Jail

On July 6, 2016, Anthony May, Jr. was booked into the Beltrami County Jail on charges of felony fleeing a peace officer in a motor vehicle, gross misdemeanor driving

while impaired, and misdemeanor driving after revocation. (Decl. Calandra Allen ("Allen Decl.") ¶ 2, Ex. 1 at 3, Nov. 24, 2020, Docket No. 23-1.) May denied having any medical issues during his medical screening and health assessment, other than treatment for back pain in 2015 and sinus surgery two years prior to the arrest. (Allen Decl. ¶ 3, Ex. 2 at 2, Nov. 24, 2020, Docket No. 23-2; Allen Decl. ¶ 4, Ex. 3 at 2, Nov. 24, 2020, Docket No. 23-3.)

On August 7, 2016, while detained pretrial, May slipped and fell in a cell and hit his chest on the toilet. (Allen Decl. ¶ 8, Ex. 7 at 2, Nov. 24, 2020, Docket No. 23-7.) May was transported to a Bemidji hospital, where an X-ray showed no cracked or misaligned ribs, but he was told that he could have small rib fractures, and was discharged with instructions to take over-the-counter pain relievers as needed and to follow up in one week if his symptoms worsened. (Allen Decl. ¶ 9, Ex. 8 at 5, Nov. 24, 2020, Docket No. 23-8.) Other inmates reported that May told them he experienced chest or rib pain when laughing or breathing after falling, but it is not clear whether May informed jail medical staff or correctional officers ("COs") of his symptoms. (*See, e.g.*, Allen Decl. ¶ 11, Ex. 10 ("Reed BCA Interview") at 8–9, Nov. 24, 2020, Docket No. 23-10.) On August 10, 2016, CO Andrew Richards asked May about the fall, and May told him that he was a little sore and doing okay. (Allen Decl. ¶ 10, Ex. 9 ("CO Incident Reports") at 4, Nov. 24, 2020, Docket No. 23-9.) The same day, other COs observed May walking around and having normal

interactions with other inmates, and noted that he did not appear to be in any medical distress. (CO Incident Reports at 11–12.)

Well-being checks were logged throughout the night on August 10 and into the early morning on August 11, and officers observed May multiple times.[1] (Decl. Stephanie Angolkar ("Angolkar Decl.") ¶ 4, Ex. 3 at 2–4, Nov. 24, 2020, Docket No. 27.) During a well-being check at 10:54 p.m., May was allowed to retrieve water and his coffee cup. (*Id.* at 13; Angolkar Decl. ¶ 3, Ex. 2 ("Olson Dep.") at 10:1–23, 11:10–16, Nov. 24, 2020, Docket No. 26-2.) Around 11:30 p.m., May was observed walking around his cell. (CO Incident Reports at 13.) CO Saul Garza observed May shift to different sleeping and arm positions during the night, and observed him lying on his back during the last check at 5:30 a.m. on August 11, at the end of his shift. (*Id.* at 12.) Garza does not recall the position of May's arms or legs at the final check or whether he saw May breathing at that time. (Angolkar Decl. ¶ 2, Ex. 1 ("Garza Dep.") at 19:21–20:8, Nov. 24, 2020, Docket No. 26-1.) CO Adam Olson also observed May sleeping in different positions during the night, and noted that May had a beverage in his cup that he drank throughout the night, with the cup being empty at 3:16 a.m. (CO Incident Report at 13.) Olson also reported that he

---

[1] The jail log shows that CO Olson logged the welfare checks, (*see* Angolkar Decl. ¶ 4, Ex. 3 at 2–4.), but officer testimony clarifies that COs Olson and Garza alternated doing the checks, (*see id.* ¶ 3, Ex. 2 ("Olson Dep.") at 19:13–17, Nov. 24, 2020, Docket No. 26-2.)

saw May sleeping on his back with his arms behind his head during the last check before shift change.  (*Id.*)

In the morning of August 11, after shift change, CO Richards performed a well-being check at 5:52 a.m. but does not recall what he observed of May at that time. (Angolkar Decl. ¶ 5, Ex. 4 ("Richards Dep.") at 20:19–21:8, Nov. 24, 2020, Docket No. 27-3.)  CO Katherine O'Bryan performed a check shortly after 6:00 a.m.[2] and observed May under blankets with his arms behind his head and did not see signs of medical distress. (Angolkar Decl. ¶ 6, Ex. 5 ("O'Bryan Dep.") at 26:19–27:16, Nov. 24, 2020, Docket No. 26-4.)

Starting around 6:30 a.m., inmates left their cells for breakfast.  (*See* Allen Decl. ¶ 18, Ex. 17 ("Jail Video"), Nov. 24, 2020, Docket No. 23-17.)  Jail surveillance video shows that an inmate looked into May's cell at 6:39 a.m., then returned to his table for breakfast, and another inmate looked into the cell at 6:41 a.m.  (*Id.*; *see also* Allen Decl. ¶ 16, Ex. 15 at 6–7, Nov. 24, 2020, Docket No. 23-15.)  At 6:43 a.m., an inmate entered May's cell, exited, and talked to another inmate; they went back into the cell together and then

---

[2] O'Bryan apparently logged the check as starting at 6:02 a.m. but the Jail Video shows the check occurring at 6:21 a.m.  (*See* O'Bryan Dep. at 19:24–20:8; Allen Decl. ¶ 18, Ex. 17 ("Jail Video") at 6:21:47, Nov. 24, 2020, Docket No. 23-17.)  The parties do not contend that this discrepancy constitutes a dispute of material fact.  There appear to be other minor timing discrepancies from the events in the morning of August 11, such as the time when the inmates pressed the jail intercom button, (*see, e.g., id.* at 23:13–15 (stating the intercom call was at approximately 6:58 a.m.); Jail Video at 6:46), but again, the parties do not rely on such discrepancies to create a fact issue.

pressed the jail intercom button around 6:46 a.m. (*See* Jail Video; *see also* CO Incident Report at 6; Reed BCA Interview at 9; Allen Decl. ¶ 14, Ex. 13 at 4–5, Nov. 24, 2020, Docket No. 23-13; Allen Decl. ¶ 15, Ex. 14 at 4–5, Nov. 24, 2020, Docket No. 23-14.)

CO Richards was conducting welfare checks in a different block when he was alerted that someone in the C Block, where May was housed, was not responding and looked blue in the face. (CO Incident Report at 3.) Richards entered C Block and radioed a medical tech. (*Id.* at 3, 6.) When Richards entered the block, two inmates were in May's cell; one told Richards that he could not find May's pulse. (*Id.* at 3.) Richards reported that when he went into May's cell, he found him lying in bed, blue in the face, cold to the touch, not breathing, and without a pulse. (*Id.*)

When the medical tech arrived, the tech and Richards moved the mattress, with May on it, to the floor. (*Id.*) According to Richards, they decided not to start CPR because May was cold to the touch. (*Id.*) The fire department arrived shortly after 7:00 a.m. (*Id.*) The fire department connected a defibrillator to run a scan and could not get a response, so no lifesaving measures were taken, and the fire department announced May's death on the scene. (*Id.*) The police department arrived at 7:14 a.m., the Bureau of Criminal Apprehension shortly thereafter, and an investigation began, including interviews with every inmate in C block. (*Id.* at 4, 6.)

An autopsy showed that May suffered a sudden cardiac death which, according to the autopsy, was a result of an undetected heart defect.[3]  (Allen Decl. ¶ 20, Ex. 19, Nov. 24, 2020, Docket No. 24.)  There is no evidence that anyone knew May had heart-related medical problems or concerns.  The death was classified as "natural due to possible sudden cardiac arrest."  (Angolkar Decl. ¶ 13, Ex. 12 at 2, Nov. 24, 2020, Docket No. 26-11.)  Plaintiff has submitted a report from an expert witness who reviewed the jail incident report, medical records, and autopsy.  (Decl. Vincent J. Moccio ("Moccio Decl.") ¶ 7, Ex. D at 1, Dec. 15, 2020, Docket No. 37-1.)  The expert agreed that May died as a result of sudden cardiac arrest, but opined that delayed recognition of May's collapse and delayed resuscitation efforts contributed to his death.  (*Id.*)

### B.    Beltrami County Jail Well-Being Check Policy & Training

Minnesota rules require jails to "have a system providing for well-being checks of inmates.  A written policy and procedures shall provide that all inmates are personally observed by a custody staff person at least once every 30 minutes."  Minn. R. 2911.5000 subpart 5.  Beltrami County Jail's well-being check policy states, "all correctional staff shall conduct well-being checks at least once every 30 minutes on all inmates, or more frequently as determined by inmate custody status and/or housing classification," and

---

[3] The autopsy identifies the cause of death as "possible sudden cardiac death," and more specifically "myocardial bridging."  (Allen Decl. ¶ 20, Ex. 19 at 2, Nov. 24, 2020, Docket No. 24.)  May's family members all testified that they were not aware of him having any heart issues or chest pain prior to falling at the Beltrami County Jail on August 7, 2016.

provides that the checks "shall be sufficient to determine whether the inmate is experiencing any stress or trauma." (Angolkar Decl. ¶ 15, Ex. 14 at 2.)

After May's death, the Minnesota Department of Corrections ("DOC") reviewed the incident and found that the Beltrami County Jail violated Minnesota Rule 2911.5000 subpart 5 because some welfare checks occurred more than 30 minutes apart.[4] (Angolkar Decl. ¶ 13, Ex. 12 at 2.) The DOC review also found that "the pace of many of these checks was observed to be very quick. It would be difficult for staff members to [observe] movement, rise and fall of the chest or other signs of life conducting checks at such a quick pace." (*Id.*) Beltrami County Sheriff Phil Hodapp challenged the DOC findings based on a discrepancy between the DOC determination and the jail's records on well-being checks. (Angolkar Decl. ¶ 17, Ex. 16, at 2–3, Nov. 24, 2020, Docket No. 26-15.) Sheriff Hodapp also took issue with the finding that the pace of the checks was too quick; the Beltrami County Jail policy was approved by the DOC,[5] so Sheriff Hodapp asserts that the statement about the pace of checks was "merely an opinion." (*Id.* at 3.)

---

[4] Assistant Administrator Calandra Allen compiled welfare check log reports from August 10 to 11, showing that 59 checks occurred less than 30 minutes apart, 19 occurred 30 minutes apart, and 6 over 30 minutes apart. (Allen Decl. ¶ 19, Ex. 18 at 2, Nov. 24, 2020, Docket No. 23-18.)

[5] When the Beltrami County Jail implemented its well-being check policy, Sheriff Hodapp reviewed and adopted it, but the policy was written by an outside organization, and was also reviewed by the DOC. (Angolkar Decl. ¶ 16, Ex. 15 at 14:23–15:18, Nov. 24, 2020, Docket No. 26-14.)

The parties dispute how the COs were trained to perform well-being checks. The parties agree that the officers were trained to confirm that an inmate was in their cell and not in obvious medical distress; they dispute whether the training included looking for signs of life or checking whether an inmate appeared to be breathing. The Field Training Manual provided to COs informs officers that jail policy defines well-being checks as "Visual checks of inmate's welfare by security personnel at irregular intervals not exceeding one-half hour." (Moccio Decl. ¶ 4, Ex. B at 5, Dec. 15, 2020, Docket No. 36-2.) Conducting welfare checks is included on the CO training worksheet, (*id.* ¶ 3, Ex. A at 5, Dec. 15, 2020, Docket No. 36-1), and the COs testified that they were trained in conducting welfare checks by shadowing other COs.

For example, at his deposition, CO Olson said that he was trained to look for signs of distress, self-harm, or harm to others, and to make sure the inmates were accounted for, but he was not told to look for signs of life or signs of breathing. (Olson Dep. at 22:20–23:24.) Similarly, CO Garza testified that he was trained to make sure all inmates were in their cells and no one is experiencing any type of distress, such as fighting, (Garza Dep. 9:9–16), but was not trained to verify that inmates are breathing during nighttime well-being checks, (*id.* at 10:6–11.) He testified that he looked for signs of life anyway, (*id.*), but when pressed stated that he was not instructed to stand at a cell door long enough to be able to see if an inmate was breathing, (*id.* at 11:2–9.) CO Richards stated that he was trained to make sure inmates were accounted for and to check for duress, such as

seizures or self-harm, but did not remember being trained to look for whether an inmate was breathing.  (Richards Dep. at 23:12–25:4.)  Sheriff Hodapp testified that he was not aware that officers were not looking for breathing or signs of life during well-being checks, but also testified that the policy did not require them to do so.  (Angolkar Decl. ¶ 16, Ex. 15 at 13:14–14:17, Nov. 24, 2020, Docket No. 26-14.)

The well-being checks the night of August 10 through the morning of August 11 were captured on video.  (*See generally* Jail Video.)  Plaintiff's expert witness reviewed the video and opined that the checks would typically be considered mere "bed checks" rather than well-being checks, because of how quickly officers conducted them.  (Moccio Decl. ¶ 6, Ex. C at 5–7, Dec. 15, 2020, Docket No. 37.)  Plaintiff's expert noted that during one check the officer only "glanced" into cells, in another the officer spent less than one minute walking both floors of the cell block encompassing eight cells, and one officer did not stop at any of the cell doors to look in the windows.  (*Id.* at 5–6.)  The expert concluded that the checks were insufficient to establish the well-being of an inmate.  (*Id.* at 6.)

## II.    PROCEDURAL HISTORY

Plaintiff Aldene Morrison, May's mother, was appointed trustee for May's heirs and next-of-kin, and she initiated this action on April 24, 2019.  (Compl. ¶ 6, Apr. 24, 2019, Docket No. 1.)  Morrison asserts claims pursuant to 42 U.S.C. § 1983 for denial of right to adequate medical care and the right to life under the Eighth and Fourteenth Amendments against the individual defendants, (2nd Am. Compl. ¶¶ 20–30, Mar. 28, 2021, Docket No.

58),[6] and against the County based on alleged unconstitutional de facto policies, (*id.* ¶¶ 31–44.)  Morrison also brought a claim for failure to train against the County and Sheriff Hodapp.  (*Id.* ¶¶ 45–49.)  Defendants filed a Motion for Summary Judgment on November 24, 2020, after the close of discovery, which is now before the Court.[7]  (Mot. Summ. J., Nov. 24, 2020, Docket No. 20.)

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[6] The now-operative Second Amended Complaint was filed after Defendants filed their Motion for Summary Judgment.  (*See* 2nd Am. Compl., Mar. 28, 2021, Docket No. 58.)  The Court will not address the newly asserted claims—Counts VI and VII for negligence—as they are not at issue in the present Motion, but will address the other claims in the Second Amended Complaint as they are identical to the claims for which Defendants seek dismissal in their Motion.

[7] After Defendants filed their Motion for Summary Judgment, Morrison filed a Motion to Amend the Complaint to assert negligence claims under Minnesota state law.  (Mot. Amend Pleadings, Dec. 10, 2020, Docket No. 32.)  Defendants opposed the motion for leave to amend as untimely and without good cause.  (*See* Mem. Opp. Mot. Amend Pleadings, Jan. 11, 2021, Docket No. 45.)  The Magistrate Judge denied the Motion to Amend on February 8, 2021, finding that Morrison did not show good cause for leave to amend.  (Order, Feb. 8, 2021, Docket No. 52.)  The Court reconsidered Morrison's motion, and granted leave to amend on March 26, 2021.  (Order, Mar. 26, 2021, Docket No. 57.)  Morrison filed an amended complaint on March 28, and Defendants answered on April 1.  (2nd Am. Compl.; Answer, Apr. 1, 2021, Docket No. 59.)

A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## II.    ANALYSIS

### A.    Correctional Officer Qualified Immunity

The Court first addresses whether the four individual Correctional Officers, Richards, Olson, Garza, and O'Bryan (the "CO Defendants"), are entitled to qualified immunity. Qualified immunity is an immunity from suit, not a defense to liability, and is lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The Court considers two questions to determine whether officials are protected by qualified immunity: (1) whether the facts shown, when viewed in the light most favorable to the plaintiff, support a finding that an officer's conduct violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the incident such that a reasonable officer would have known their actions

were unlawful.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  For a right to be clearly established, existing precedent must place the constitutional question beyond debate.  *White v. Pauly*, 137 S. Ct. 548, 551 (2017).  "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions."  *Nelson v. Corr. Med. Serv.*, 583 F.3d 522, 528 (8th Cir. 2009).

### 1.     Count I: Failure to Provide Adequate Medical Care

The first claim asserted against the CO Defendants is Count I for failure to provide adequate medical care to May.  An inmate has a right to adequate medical attention, and deliberate indifference to a prisoner's serious medical needs is a well-established constitutional violation.[8]  *Langford v. Norris*, 614 F.3d 445, 459 (8th Cir. 2010).  As such, the only issue for qualified immunity as to Count I is whether the record supports a finding that the correctional officers' conduct violated May's right.

Deliberate indifference to serious medical needs is established if (1) a plaintiff had an objectively serious medical need, and (2) prison officials knew of the need but deliberately disregarded it.  *Hott v. Hennepin Cnty.*, 260 F.3d 901, 905 (8th Cir. 2001).  An

---

[8] Because May was a pretrial detainee, his rights are analyzed under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment.  *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).  However, "[t]he Fourteenth Amendment guarantees pre-trial detainees at least as many protections as does the Eighth Amendment," and the same standards apply for both failure to provide adequate medical care and failure to protect under a due process analysis as under an Eighth Amendment  analysis.  *Hott v. Hennepin Cnty.*, 260 F.3d 901, 905 (8th Cir. 2001).

objectively serious medical need must have been diagnosed or obvious to a layperson, *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016), and thus only May's rib injury could constitute a serious medical need, since it had been diagnosed, whereas May's latent heart defect was neither diagnosed nor obvious. Yet, even assuming May's rib injury was an objectively serious medical need, the record does not support a reasonable inference of deliberate indifference because there is no evidence that the CO Defendants knew of any risk to May based on their observations of May leading up to his death. *See Vaughn v. Greene Cnty.*, 438 F.3d 845, 850–51 (8th Cir. 2006) (requiring evidence that officers knew of a risk and knew conduct was inappropriate in light of that risk for a finding of deliberate indifference). Therefore, no reasonable jury could find that a violation occurred, and the CO Defendants are entitled to qualified immunity as to Count I.

### 2. Count II: Failure to Protect from Harm

Morrison also levies Count II, failure to protect from generalized harm, against the CO Defendants, asserting that the cursory well-being checks performed by the COs the night of May's death violated his right to protection from generalized harm. A claim based on failure to protect requires showing that the jail or its officials "were deliberately indifferent to a substantial risk of serious harm." *Hott*, 260 F.3d at 906. However, "[u]nlike inadequate medical care claims, for the purposes of failure to protect claims, it does not matter whether a prisoner faces an excessive risk [of harm] for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* (cleaned up). For

example, a substantial risk of serious harm exists from the possibility of inmate assaults. *Id.* at 906 (citing *Doe v. Washington Cnty.*, 150 F.3d 920, 922–23 (8th Cir. 1998) and *Jensen v. Clarke*, 73 F.3d 808, 810 (8th Cir. 1996)).  Since the right to protection from generalized harms is clearly established in certain situations, but no caselaw is directly on point to the facts here, the Court must determine whether other cases establish a right that is sufficiently similar such that it was beyond debate that May had a right to be monitored through adequate well-being checks.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

In *Hott*, which Morrison argues shows that May's right to protection was clearly established, the plaintiff, trustee of an inmate who died by suicide while detained, contended that the jailor's failure to conduct cell checks every 30 minutes constituted deliberate indifference to the inmate's safety.  *Hott*, 260 F.3d at 906.  The Eighth Circuit concluded that the record was insufficient to support an inference that the jailor was subjectively aware that the risk of suicide among inmates amounted to a substantial risk to general inmate safety such that failing to conduct checks constituted deliberate indifference to the constitutional right to protection from general harm.  *Id.* at 907–08.

Thus, *Hott* stands for the premise that there may be a constitutional right to well-being checks every 30 minutes, but the right is only violated if the jailor who fails to conduct them is deliberately indifferent to a known substantial risk of harm.  *See id.*  Yet *Hott* says nothing about the requisite nature of well-being checks, such as what an officer must look for or how long the check must last—the aspects of well-being checks at issue

here—nor did the Eighth Circuit address whether checks are constitutionally required in the absence of a known risk of inmate suicide. Moreover, at least one decision since *Hott* found that there is no federal right to well-being checks, *see Heil v. Sherburne Cnty.*, No. 08-1419, 2010 WL 11646720, at *6 (D. Minn. Apr. 7, 2010) ("[A]ny failures to complete the thirty-minute well-being checks, as required by state law and Sherburne County Jail policy, do not support a § 1983 claim because no federal right is involved."), and another has found that such a right is, at a minimum, not clearly established, (*see* ECF No. 18-226 *Victornio v. Hayes et al.*, Order at 11–12, Nov. 12, 2019, Docket No. 37.)[9] Thus, whether deficient well-being checks violate an inmate's right to protection from general harm is not beyond debate, meaning any such right is not clearly established and the CO Defendants are entitled to qualified immunity on Count II.

In sum, the Court finds that the individual CO defendants are immune from suit, and the Court will grant the Defendants' Motion as to Counts I and II.

## B. Beltrami County Municipal Liability

Morrison asserts claims for violations of the right to adequate medical care (Count III) and substantive due process (Count IV) based on the Beltrami County Jail's application of its well-being check policy, and a claim for failure to train (Count V) against Beltrami

---

[9] Defendants also filed this unpublished Order as an attachment to their Reply Memorandum. (*See* Reply Mem. Supp. Mot. Summ. J. at 22–40, Dec. 29, 2020, Docket No. 39.)

County.  Municipal liability for a constitutional violation attaches only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee.  *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016).  "[A] municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom," including when the official is entitled to immunity from suit.  *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018).

### 1.    Unconstitutional Well-Being Check Custom

Morrison asserts that Beltrami County Jail has a de facto unconstitutional well-being check policy, which the Court understands to be an unconstitutional custom allegation.[10]  A claim based on an unofficial custom requires a showing of (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by government employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality after having notice of it; and (3) that the custom was the moving force behind the constitutional violation.  *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998).

––––––––––––––––––––––

[10] For purposes of municipal liability, a "policy" is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  Morrison does not assert that the official written well-being check policy itself is unconstitutional.  Rather, the claim focuses on how the policy was implemented or followed, suggesting that the claim is about an unofficial custom rather than the official policy.

Morrison has explained neither how the record establishes a continuing, widespread, and persistent pattern of unconstitutional misconduct, nor how the record supports an inference that Beltrami County itself was deliberately indifferent to or tacitly authorized the unconstitutional conduct after having notice of it. Moreover, because there was no violation of the constitutional right to adequate medical care and any right to well-being checks under the circumstances of May's death is not clearly established, no reasonable jury could find that there was a constitutional violation or that Beltrami County could have been on actual notice of a violation. Therefore, the Court will grant Defendants' Motion as to Counts III and IV, which are both based on the customary application of the well-being check policy.

### 2. Failure to Train

Morrison claims that Beltrami County is liable for failure to train its correctional officers in how to conduct an adequate well-being check. A municipality may be liable for failure to train employees when (1) the municipality's hiring and training practices are inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting those practices, such that the failure to train reflects a deliberate or conscious choice; and (3) an alleged deficiency in the municipality's hiring or training procedures actually caused the plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (quotation omitted).

Morrison has presented evidence from an expert witness who viewed jail surveillance video and opined that the well-being checks conducted by the COs the night of May's death were inadequate to ensure inmate well-being.  Yet the COs testified that the checks performed were consistent with their training to check for obvious signs of distress but not to check for signs of life such as breathing.  Further, the record shows that the Field Training Manual provided to COs does not include any information about the purpose of the well-being checks and that there is no formalized training.  As such, the record, when viewed in the light most favorable to Morrison, supports a reasonable inference that the training measures were inadequate to accomplish the goal of well-being checks.

Whether Beltrami County was deliberately indifferent to inmates' rights when establishing its well-being check training is an objective inquiry.  *Farmer v. Brennan*, 511 U.S. 825, 840–41 (1994).  If the need for more or different training is obvious and the inadequacy of training is likely to result in a violation of constitutional rights, the municipality is deliberately indifferent.  *Id.*  Unlike individual officer liability which requires a showing of subjective deliberate indifference, municipal "liability is appropriate when policymakers are on actual or constructive notice of the need to train."  *Id.* at 841 (quotation omitted).  In other words, there are two steps to evaluating deliberate indifference: first, whether constitutional rights were at stake; and second, whether the need for more training to protect those rights was obvious.

First, inmates have constitutional rights to, at minimum, adequate medical care and protection from general harms such as assault. *See Hott*, 260 F.3d at 906. The Beltrami County Jail well-being check policy requires that checks be sufficient to determine whether an inmate is experiencing stress or trauma, which the record shows means at least checking for medical duress and fighting among inmates. Therefore, the well-being check policy is aimed at preventing the same harms protected by an inmate's constitutional rights. By extension, failing to train officers to comply with the well-being check policy jeopardizes an inmate's rights.

Second, because well-being checks are required by jail policy and state rule and protect constitutional rights, yet Beltrami County implemented no formal training on how to conduct them but merely followed a shadowing system, a reasonable jury could conclude that the need for additional training was obvious. Sheriff Hodapp's testimony that he did not know the precise contours of the well-being check training bolsters an inference of deliberate indifference. Thus, there remains a genuine dispute of material fact as to whether the County was deliberately indifferent to inmates', including May's, rights.

Lastly, there also remains a question of fact as to the causal link between any inadequacy in training and May's death. Morrison contends that if the COs had been more thorough in their well-being checks they may have recognized signs of medical

distress in May and been able to intervene in a timely fashion, thereby increasing the chances that he would have survived his cardiac arrest.

In sum, because the well-being check policy protects constitutional rights and the record supports a reasonable inference that Beltrami County failed to train its officers to conduct adequate checks, the Court will deny the Defendants' Motion as to Count V for failure to train.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 20] is **GRANTED in part** and **DENIED in part** as follows:

1.  The Motion is **GRANTED** with respect to all claims against Defendants Andrew Richards, Saul Garza, Adam Olson, and Katherine O'Bryan;

2.  The Motion is **GRANTED** with respect to Count IV against Beltrami County;

3.  The Motion is **DENIED** with respect to Count V against Beltrami County and Sheriff Hodapp in his official capacity; and

4.  Counts I, II, III, and IV are **DISMISSED with prejudice**.


DATED:  June 2, 2021
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court