**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| ALDENE MORRISON, *as Trustee for Heirs and Next-of-Kin of Anthony May, Jr., deceased*, | Civil No. 19-1107 (JRT/LIB) |
| Plaintiff, | |
| v. | |
| BELTRAMI COUNTY; SHERIFF PHIL HODAPP, *individually and in his capacity as Beltrami County Sheriff*; and ANDREW RICHARDS, SAUL GARZA, ADAM OLSON, and KATHERINE O'BRYAN, *individually and in their capacities as Beltrami County Jail Correctional Officers*, | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY** |
| Defendants. | |

---

Vincent J. Moccio, **BENNEROTTE & ASSOCIATES PA**, 3085 Justice Way, Suite 200, Eagan, MN 55121, for plaintiff.

Stephanie A. Angolkar and Jason M. Hiveley, **IVERSON REUVERS**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Anthony May, Jr. died of sudden cardiac arrest while in pretrial detention at the Beltrami County Jail. His mother, Plaintiff Aldene Morrison, brings this action against the four corrections officers who were on duty the night of May's death and against Beltrami County and the Beltrami County Sheriff. At the heart of the matter is a dispute over Beltrami County Jail's inmate well-being check practices. After the Court granted in part and denied in part Defendants' First Motion for Summary Judgment, Morrison's failure to

train claim against Beltrami County and the Beltrami County Sheriff in his official capacity and Morrison's negligence claims against all Defendants from the Second Amended Complaint are still pending. Defendants have filed a Second Motion for Summary Judgment on all remaining claims asserted in the Second Amended Complaint. Defendants have also moved to exclude the testimony of Morrison's expert Dr. Alexander Chernobelsky.

The record still supports—as the Court previously held—a reasonable inference that the Beltrami County Jail was deliberately indifferent to inmates' rights when implementing its training regimen on well-being checks. The Court's prior dismissal of the due process claims also does not preclude a finding of deliberate indifference to the generalized harms to the inmate population. Therefore, a genuine dispute of material fact still remains as to Beltrami County's alleged failure to train and the County and Sheriff are not entitled to judgment as a matter of law on this claim. However, because the cause of May's death was not reasonably foreseeable, Defendants are entitled to summary judgment on the negligence claims. The Court will therefore deny Defendants' Motion as to Count V against Beltrami County and the Sheriff in his official capacity and grant the Motion as to Counts VI and VII against all Defendants.

Because Dr. Chernobelsky is qualified to testify on the subjects on which he opines and his testimony is likely to be helpful to the factfinder, the Court will deny Defendants' Motion to Exclude Dr. Chernobelsky's testimony.

**BACKGROUND**

I.    **FACTUAL BACKGROUND[1]**

A.    **May's Pretrial Detention and Death at Beltrami County Jail**

On July 6, 2016, Anthony May, Jr. was booked into the Beltrami County Jail on charges of felony fleeing a peace officer in a motor vehicle, gross misdemeanor driving while impaired, and misdemeanor driving after revocation.  (2nd Decl. of Calandra Allen ("2nd Allen Decl."), Ex. 1 at 2, Sept. 28, 2021, Docket No. 80.)  May denied having any medical issues during his medical screening and health assessment, other than treatment for back pain in 2015 and sinus surgery two years prior to the arrest.  (2nd Allen Decl., Ex. 2 at 2; 2nd Allen Decl., Ex. 3 at 2.)

On August 7, 2016, while detained pretrial, May slipped and fell in a cell and hit his chest on the toilet.  (2nd Allen Decl., Ex. 7 at 2–3.)  May was transported to a Bemidji hospital, where an X-ray showed no cracked or misaligned ribs, but he was told that he

_____

[1] The Court laid out the relevant facts in its Order on Defendants' First Motion for Summary Judgment.  *Morrison v. Beltrami Cnty.*, No. 19-1107, 2021 WL 2228093, at *1–4 (D. Minn. June 2, 2021).  When filing their Second Motion for Summary Judgment, Defendants' filed declarations in support of their Motion that are identical to those they filed with their first motion except that one of the declarations includes two new exhibits.  (*Compare* 2nd Decl. of Calandra Allen, Sept. 28, 2021, Docket No. 80, *and* 4th Decl. of Stephanie Angolkar, Sept. 28, 2021, Docket No. 77, *with* 1st Decl. of Calandra Allen, Nov. 24, 2020, Docket No. 23, *and* 1st Decl. of Stephanie Angolkar, Nov. 24, 2020, Docket No. 26.)  Morrison, however, referred the Court back to the original declaration she filed in response to Defendants' First Motion.  (Pl.'s Mem Opp. 2nd Summ. J. Mot. at 4 n.1, Oct. 22, 2021, Docket No. 84.)  For clarity, the facts here are, to a great deal, repeated from the Court's previous Order, but citations to Defendant's declarations are to the new declarations.  For documents other than depositions, the Court uses CM/ECF pagination.

could have small rib fractures and was discharged with instructions to take over-the-counter pain relievers as needed and to follow up in one week if his symptoms worsened. (2nd Allen Decl., Ex. 8 at 5.)  Other inmates reported that May told them he experienced chest or rib pain when laughing or breathing after his fall, but it is not clear whether May informed jail medical staff or correctional officers ("COs") of his symptoms.  (*See, e.g.*, 2nd Allen Decl., Ex. 10 ("Reed BCA Interview") at 8–9.)  On August 10, 2016, CO Andrew Richards asked May about the fall, and May told him that he was a little sore and doing okay.  (2nd Allen Decl., Ex. 9 ("CO Incident Reports") at 4.)  The same day, other COs observed May walking around and having normal interactions with other inmates and noted that he did not appear to be in any medical distress.  (*Id.* at 11–12.)

Well-being checks were logged throughout the night on August 10 and into the early morning on August 11, and officers observed May multiple times.  (*See* 4th Decl. of Stephanie Angolkar ("4th Angolkar Decl."), Ex. 3 ("Activity Log") at 2–4, Sept. 28, 2021, Docket No. 78.)[2]  During a well-being check at 10:54 p.m., May was allowed to retrieve water and his coffee cup.  (4th Angolkar Decl., Ex. 2 ("Olson Dep.") at 10:10–23, 11:10–12:6, Sept. 28, 2021, Docket No. 77.)  Around 11:30 p.m., May was observed walking around his cell.  (CO Incident Reports at 13.)  CO Saul Garza observed May shift to different sleeping and arm positions during the night and observed him lying on his back during a

---

[2] The jail log shows that CO Olson logged the well-being checks, (*see* Activity Log at 2–4.), but officer testimony clarifies that COs Olson and Garza alternated doing the checks.  (*See* 4th Angolkar Decl., Ex. 2 at 19:13–17, Sept. 28, 2021, Docket No. 77.)

check at around 5:30 a.m. on August 11, at the end of his shift.  (*Id.* at 12; Activity Log at 2; 4th Angolkar Decl., Ex. 1 ("Garza Dep.") at 18:17–20:8.)  Garza does not recall the position of May's arms or legs at the final check or whether he saw May breathing at that time. (Garza Dep. at 19:21–20:8.)  CO Adam Olson also observed May sleeping in different positions during the night, and noted that May had a beverage in his cup that he drank throughout the night, with the cup emptied by 3:16 a.m.  (CO Incident Report at 13.)  Olson also reported that he saw May sleeping on his back with his arms behind his head during the last check before shift change.  (*Id.*)

In the morning of August 11, after shift change, CO Richards performed a well-being check at 5:52 a.m. but does not recall what he observed of May at that time.  (4th Angolkar Decl., Ex. 4 ("Richards Dep.") at 20:19–21:8.)  CO Katherine O'Bryan performed a check shortly after 6:00 a.m.[3] and observed May under blankets with his arms behind his head and did not see signs of medical distress.  (4th Angolkar Decl., Ex. 5 ("O'Bryan Dep.") at 26:01–27:16.)

---

[3] O'Bryan logged the check as starting at 6:02 a.m. but jail surveillance video shows the check occurring at 6:21 a.m. (*See* 4th Angolkar Decl., Ex. 5 ("O'Bryan Dep.") at 19:24–20:8; Activity Log at 2; 2nd Allen Decl., Ex. 17 ("Jail Video") at 6:21.)  The parties do not contend that this discrepancy constitutes a dispute of material fact.  There appear to be other minor timing discrepancies from the events in the morning of August 11, such as the time when the inmates pressed the jail intercom button, (*see, e.g.*, O'Bryan Dep. at 23:13–15 (stating the intercom call was at approximately 6:58 a.m.); Activity Log at 2; Jail Video at 6:46), but again, the parties do not rely on such discrepancies to create a fact issue.

Starting around 6:30 a.m., inmates left their cells for breakfast. (*See* 2nd Allen Decl., Ex. 17 ("Jail Video").)  Jail surveillance video shows that an inmate looked into May's cell at 6:39 a.m., then returned to his table for breakfast, and another inmate looked into the cell at 6:41 a.m.  (*Id.* at 6:39–41; *see also* 2nd Allen Decl., Ex. 15 at 6–7.)  At 6:43 a.m., an inmate entered May's cell, exited, and talked to another inmate; they went back into the cell together and then pressed the jail intercom button around 6:46 a.m.  (*See* Jail Video at 6:43–46; *see also* CO Incident Report at 6; Reed BCA Interview at 9; 2nd Allen Decl., Ex. 13 at 4–5; 2nd Allen Decl., Ex. 14 at 4–5.)

CO Richards was conducting well-being checks in a different block when he was alerted that someone in the C Block, where May was housed, was not responding and looked blue in the face.  (CO Incident Report at 3.)  Richards entered C Block and radioed a medical tech.  (*Id.* at 3, 6.)  When Richards entered the block, two inmates were in May's cell; one told Richards that he could not find May's pulse.  (*Id.* at 3.)  Richards reported that when he went into May's cell, he found him lying in bed and blue in the face.  (*Id.*)

When the medical tech arrived, the tech, Richards, and another officer moved the mattress, with May on it, to the floor.  (*Id.*)  According to Richards, they decided not to start CPR because May was cold to the touch.  (*Id.*)  The fire department arrived shortly after 7:00 a.m.  (*Id.*)  The fire department connected a defibrillator to run a scan and could not get a response.  (*Id.*)  The police department arrived at 7:14 a.m., taking the first report of May's death, the Bureau of Criminal Apprehension arrived shortly thereafter,

and an investigation began, including interviews with every inmate in C block. (*Id.* at 3–4, 6.)

An autopsy showed that May suffered a sudden cardiac death which, according to the autopsy, was a result of an undetected heart defect.[4] (2nd Allen Decl., Ex. 19, Sept. 28, 2021, Docket No. 81.) There is no evidence that anyone knew May had heart-related medical problems or concerns.[5] The death was classified as "natural due to possible sudden cardiac arrest." (4th Angolkar Decl., Ex. 12 at 2.)

Morrison submitted a report from Dr. Alexander Chernobelsky, as an expert witness, who reviewed the jail incident report, medical records, and autopsy. (Decl. of Vincent J. Moccio ("Moccio Decl."), Ex. D at 1 ("Chernobelsky Report"), Dec. 15, 2020, Docket No. 36.) Dr. Chernobelsky agreed that May died as a result of sudden cardiac arrest. (*Id.*) Sudden cardiac death is a "[s]udden and unexpected death occurring within an hour of the onset of symptoms, or occurring in patients found dead within 24 h[ours] of being asymptomatic and presumably due to a cardiac arrhythmia or hemodynamic catastrophe." (*Id.* (citation omitted).) CPR and defibrillation are the most common

---

[4] The autopsy identifies the cause of death as "possible sudden cardiac death," and more specifically "myocardial bridging." (2nd Allen Decl., Ex. 19 at 2, Sept. 28, 2021, Docket No. 81.) Morrison's expert, Dr. Chernobelsky, indicated the presence of myocardial bridging has no effect on his conclusion that May died of sudden cardiac arrest. (4th Angolkar Decl., Ex. 18 at 21:12–21.) The parties do not contend that this creates a dispute of material fact.

[5] May's family members all testified that they were not aware of him having any heart issues or chest pain prior to falling at the Beltrami County Jail on August 7, 2016. (*E.g.*, 4th Angolkar Decl., Ex. 6 at 39:15–23; 4th Angolkar Decl., Ex. 7 at 13:25–14:2; 4th Angolkar Decl., Ex. 8 at 19:11–13.)

treatments.  (*Id.*)  According to Dr. Chernobelsky, every one-minute delay in defibrillation reduces the chance of survival by 10-12% from the previous minute.  (*Id.*)  Survival rates are affected by several variables including when CPR or defibrillation are initiated and the reason for the arrhythmia.  (*See* 4th Angolkar Decl., Ex. 18 ("Chernobelsky Dep.") at 33:2–19; 39:22–40:17.)  A person may be able to survive more than 10 minutes.  (*See id.* at 39:25–40:17.)  A person can be resuscitated even if the person has stopped breathing. (*Id.* at 48:4–10.)  Dr. Chernobelsky opined that delayed recognition of May's collapse and delayed resuscitation efforts "likely contributed" to his death.  (Chernobelsky Report.)

**B.   Beltrami County Jail Well-Being Check Policy & Training**

Minnesota rules require jails to "have a system providing for well-being checks of inmates.  A written policy and procedure shall provide that all inmates are personally observed by a custody staff person at least once every 30 minutes."  Minn. R. 2911.5000, subpart 5.  Beltrami County Jail's well-being check policy states, "all correctional staff shall conduct well-being checks at least once every 30 minutes on all inmates, or more frequently as determined by inmate custody status and/or housing classification," and provides that the checks "shall be sufficient to determine whether the inmate is experiencing any stress or trauma."  (4th Angolkar Decl., Ex. 14 at 2.)

After May's death, the Minnesota Department of Corrections ("DOC") reviewed the incident and found that the Beltrami County Jail violated Minnesota Rule 2911.5000,

subpart 5 because some well-being checks occurred more than 30 minutes apart.[6] (4th Angolkar Decl., Ex. 12 at 2.) The DOC review also found that "the pace of many of these checks was observed to be very quick. It would be difficult for staff members to [observe] movement, rise and fall of the chest or other signs of life conducting checks at such a quick pace." (*Id.*) Beltrami County Sheriff Phil Hodapp challenged the DOC findings based on a discrepancy between the DOC determination and the jail's records on well-being checks. (4th Angolkar Decl., Ex. 16 at 2–3.) Sheriff Hodapp also took issue with the finding that the pace of the checks was too quick as the Beltrami County Jail policy was approved by the DOC,[7] so Sheriff Hodapp asserted that the statement about the pace of checks was "merely an opinion." (*Id.* at 3.)

The parties dispute how the COs were trained to perform well-being checks. The parties agree that the officers were trained to confirm that an inmate was in their cell and not in obvious medical distress; they dispute whether the training included looking for signs of life or checking whether an inmate appeared to be breathing. The Field Training Manual provided to COs informs officers that jail policy defines well-being checks as "Visual checks of inmate's welfare by security personnel at irregular intervals not

---

[6] Assistant Administrator Calandra Allen compiled well-being check log reports from August 10 to 11, showing that 59 checks occurred fewer than 30 minutes apart, 19 occurred 30 minutes apart, and 6 occurred more than 30 minutes apart. (2nd Allen Decl., Ex. 18 at 2.)

[7] When the Beltrami County Jail implemented its well-being check policy, Sheriff Hodapp reviewed and adopted it, but the policy was written by an outside organization, and was also reviewed by the DOC. (4th Angolkar Decl., Ex. 15 at 14:23–15:18.)

exceeding one-half hour." (Moccio Decl., Ex. B at 5.) Conducting well-being checks is included on the CO training worksheet, (Moccio Decl., Ex. A at 5), and the COs testified that they were trained in conducting well-being checks by shadowing other COs. (Garza Dep. at 7:18–25; O'Bryan Dep. at 41:12–42:17.) COs either testified that there was not or that they do not remember any classroom or written training or assessment on conducting well-being checks. (Garza Dep. at 8:1–9:2; Olson Dep. at 25:16–26:3; *see* O'Bryan Dep. at 41:12–42:9.)

As to the shadow training, at his deposition, CO Olson said that he was trained to look for signs of distress, self-harm, or harm to others, and to make sure the inmates were accounted for, but he was not told to look for signs of life or signs of breathing. (Olson Dep. at 22:20–23:24.) Similarly, CO Garza testified that he was trained to make sure all inmates were in their cells and no one is experiencing any type of distress, such as fighting, but that although he looked for signs of life during nighttime well-being checks, this did not include verifying that inmates are breathing. (Garza Dep. at 9:9–16, 10:6–11.) He testified that he was not instructed to—and did not in practice—stand at a cell door long enough to be able to see if an inmate was breathing. (*Id.* at 11:2–9.) CO Richards stated that he was trained to make sure inmates were accounted for and to check for duress, such as seizures or self-harm, but did not remember being trained to look for whether an inmate was breathing. (Richards Dep. at 23:12–25:4.) Sheriff Hodapp testified that he was not aware that officers were not looking for breathing or signs of life during well-

being checks, but also testified that the policy did not require them to do so. (4th Angolkar

Decl., Ex. 15 at 13:14–14:17.)  He also testified that ensuring inmates were alive just

meant they were ensuring they were not showing signs of distress.  (*Id.* at 14:7–10.)

Sheriff Hodapp testified that he was not involved in creating the well-being check training.

(*Id.* at 11:16–19)

## II.    PROCEDURAL HISTORY

Morrison, May's mother, was appointed trustee for May's heirs and next-of-kin,

and she initiated this action on April 24, 2019.  (Compl. ¶ 6, Apr. 24, 2019, Docket No. 1.)

Morrison asserted claims pursuant to 42 U.S.C. § 1983 for denial of the right to adequate

medical care and the right to life under the Eighth and Fourteenth Amendments against

the individual defendants in Counts I and II, and against the County based on alleged

unconstitutional de facto policies in Counts III and IV.  (2nd Am. Compl. ¶¶ 20–44, Mar.

28, 2021, Docket No. 58.)  In Count V, Morrison also brought a claim for failure to train

against the County and Sheriff Hodapp.  (*Id.* ¶¶ 45–49.)  Finally, Morrison brought a

negligence claim against the individual defendants regarding their conduct of the well-

being checks in Count VI, and a negligence claim against the County and Sheriff Hodapp

regarding their training and supervising of jail staff in Count VII.  (*Id.* at ¶¶ 50–52, 15–17[8].)

---

[8] The paragraph numbering for Count VII contains errors; therefore, this citation to 15–17 refers to the page numbers for Count VII.

Defendants filed their First Motion for Summary Judgment on November 24, 2020, seeking to dismiss Counts I through V against all defendants.[9]  (1st Mot. Summ. J., Nov. 24, 2020, Docket No. 20.)  The Court granted summary judgment to Defendants on Counts I through IV but denied summary judgment to the County and Sheriff Hodapp in his official capacity on Count V for failure to train.  *Morrison v. Beltrami Cnty.*, No. 19-1107, 2021 WL 2228093, at *8 (D. Minn. June 2, 2021).  The Court held that because the record supported a reasonable inference that the County failed to train its officers to conduct adequate well-being checks, there was a genuine dispute of material fact that precluded finding that the County and Sheriff Hodapp were entitled to judgment as a matter of law on Count V.  *Id.* at *7–8.  As a result, prior to Defendants' Second Motion for Summary Judgment, the remaining pending counts are Counts V through VII.

On September 28, 2021, Defendants filed a Second Motion for Summary Judgment, which is now before the Court, seeking to dismiss the remaining claims. (2nd Mot. Summ. J., Sept. 28, 2021, Docket No. 74.)  Defendants also filed a Motion to Exclude the expert testimony of Dr. Chernobelsky.  (Mot. Exclude, Sept. 28, 2021, Docket No. 69.)

---

[9] The now-operative Second Amended Complaint was filed after Defendants filed their First Motion for Summary Judgment.  (*See* 1st Mot. Summ. J., Nov. 24, 2020, Docket No. 20; 2nd Am. Compl.)  Therefore, only Counts I through V from the First Amended Complaint were at issue for the First Motion for Summary Judgment.  *See Morrison*, 2021 WL 2228093, at *4 n.6.  The First Amended Complaint only alleged five counts, and the Second Amended Complaint then added Counts VI and VII for negligence.  (*Compare* 1st Am. Compl., May 7, 2019, Docket No. 5, *with* 2nd Am. Compl.)

**DISCUSSION**

**I.      MOTION TO EXCLUDE**

**A.      Standard of Review**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.

*McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021).  An expert's opinion

testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court has a gate-keeping obligation to make certain that all testimony

admitted under Rule 702 satisfies these prerequisites and that "any and all scientific

testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell*

*Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has

the burden of establishing by a preponderance of the evidence that the expert is qualified,

that the methodology used is scientifically valid, and that "the reasoning or methodology

in question is applied properly to the facts in issue*."  Marmo v. Tyson Fresh Meats, Inc.*,

457 F.3d 748, 757–58 (8th Cir. 2006). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* at 757.

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* at 758. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (quoting *Daubert*, 509 U.S. at 595). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

### B.    Analysis

Morrison retained Dr. Chernobelsky to offer an opinion on whether May could have been resuscitated after he stopped breathing or exhibited other detectable signs of his cardiac arrest and whether a delay in recognizing May's cardiac arrest and therefore a delay in providing care increased the likelihood of May's death. (*See* Chernobelsky Report; Chernobelsky Dep. at 40:18–41:25, 48:4–10.) Defendants argue his testimony should be excluded because (1) his testimony is speculative and unsupported by the facts because Dr. Chernobelsky does not know when May suffered his cardiac arrest or whether May exhibited any outward signs of distress prior to when he stopped breathing and (2) he is not qualified to testify about what signs May experienced during his cardiac

arrest or when he may have exhibited them.  According to Defendants, Dr. Chernobelsky's testimony is therefore not useful.

It is undisputed that Dr. Chernobelsky is a well-qualified cardiologist who is qualified to testify about the physiological changes that occur during cardiac arrest.  It is also undisputed that he is qualified to testify about the possibility of resuscitation and the changes in survival rates over time after signs of cardiac arrest are exhibited.

A central issue in the case is the connection between the sufficiency of the well-being checks and May's death.  Specifically, Defendants argue that, due to the nature of cardiac arrest, the type of well-being checks Morrison contends should have been conducted may not have been sufficient to prevent May's death.  Therefore, even if the checks were inadequate, this inadequacy did not cause May's death.  Dr. Chernobelsky's testimony is useful to evaluate this issue because it could help a factfinder evaluate whether May could have been resuscitated even after he stopped breathing.  This, in turn, could be valuable in determining the likelihood that May would have survived had Defendants conducted the checks Morrison contends they should have.

Dr. Chernobelsky bases his testimony on an evaluation of all the relevant records available in this case, his medical training and knowledge, and studies he cites in his report and deposition.  Nothing indicates that Dr. Chernobelsky's application of the facts to these methods is sufficiently unreliable to warrant exclusion.  The core of Dr. Chernobelsky's testimony is that (1) had May's cardiac arrest been detected earlier, his odds of survival

would have been greater and the failure to detect the cardiac arrest earlier thus likely contributed to his death and (2) resuscitation is possible even after one stops breathing. Nothing suggests that this is speculative, unsupported by the facts or medical evidence, or is an improper application of Dr. Chernobelsky's training or the studies he cites.

Defendants' attacks on Dr. Chernobelsky testimony are unconnected to the offered testimony and the purposes for which it is offered.  While it is true that Dr. Chernobelsky does not have experience with medical care in a corrections setting, nothing indicates specific expert knowledge is required to opine on a cardiac arrest that occurs in a corrections facility.  Contrary to Defendants' assertion, nowhere in Dr. Chernobelsky's testimony does he assume that officers would be immediately alerted or immediately respond to a medical emergency, nor does he purport to know when May suffered cardiac arrest.  Instead, he asserts that had officers been aware earlier, the odds of survival would have been higher.  This opinion fits with Morrison's theory that more fulsome well-being checks may have made officers aware earlier.  Vigorous cross-examination about these issues and presentation of other evidence are better methods than exclusion of revealing any purported gaps between Dr. Chernobelsky's testimony and Morrison's theory.[10]

---

[10] Indeed, Defendants use Dr. Chernobelsky's testimony to argue that any deficiency in the well-being checks is not causally connected to May's death.  (*See* Defs.' Mem. Supp. Mot. Summ. J. at 17–21, 26, Sept. 28, 2021, Docket No. 76.)

For the purposes Morrison offers Dr. Chernobelsky's testimony, he is qualified, and the testimony is sufficiently useful, reliable, and based on the facts of the case to put before the factfinder.  Therefore, the Court will not exclude Dr. Chernobelsky's testimony at this stage.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

B.     Analysis

1.     Failure to Train Claim

Morrison claims that Beltrami County and Sheriff Hodapp, in his official capacity, are liable for failure to train the Beltrami County Jail's COs in how to conduct an adequate well-being check.  A municipality may be liable for failure to train employees when: (1) the municipality's hiring and training practices are inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting those practices, such that the failure to train reflects a deliberate or conscious choice; and (3) an alleged deficiency in the municipality's hiring or training procedures actually caused the plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).

The Court has already denied Defendants' First Motion for Summary Judgment on this claim holding that inmates have constitutional rights to adequate medical care and protections from general harms and that genuine disputes of material fact remain as to (1) whether the County was indifferent to these rights and (2) causation.  *Morrison*, 2021 WL 2228093, at *7–8.  Defendants contend that the Court should now grant summary judgment on this claim (1) because there is additional evidence that now shows there is no genuine dispute as to causation and (2) because the Court dismissed the due process claims, it must also dismiss the failure to train claim.

First, a question of fact as to the causal link between any inadequacy in training and May's death remains.  As the Court explained, Morrison contends that if the COs had

been more thorough in their well-being checks, they may have recognized signs of medical distress in May and been able to intervene in a timely fashion. This would have, in turn, increased the chances that May would have survived his cardiac arrest. Although Morrison cannot rely on mere speculation or conjecture to survive summary judgment, Morrison need not point to the precise moment of death, when May ceased breathing, or which specific check was conducted improperly to survive summary judgement. *Cf. Hott v. Hennepin Cnty.*, 260 F.3d 901, 904, 908–09 (8th Cir. 2001) (an hours-long gap between proper well-being checks did not render a plaintiff's claim speculative as to causation). Morrison's claim is predicated on whether properly conducted well-being checks would have increased the likelihood of survival by, for example, discovering that May was not breathing earlier. Morrison's claim is not that properly conducted checks would have guaranteed May's survival. Dr. Chernobelsky's testimony supports a finding that a person can be resuscitated even after breathing stops and that May's chances of survival decreased with each minute the cessation of his breathing went undiscovered. A jury may ultimately conclude that Morrison's theory of causation is too tenuous to support a finding of liability, but for now, a dispute remains as to whether proper well-being checks would have increased the likelihood May would have survived his cardiac arrest.[11]

---

[11] There is also still a factual dispute over whether the County was deliberately indifferent to inmates' rights in conducting its training. *Morrison*, 2021 WL 2228093, at *7.

Second, the fact that the Court dismissed the other constitutional claims does not require the Court to dismiss the failure to train claim against the County and Sheriff.  To establish municipal liability, "there must be an unconstitutional act by a municipal employee," but there "need not be a finding that a municipal employee is liable in his or her individual capacity."  *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (citations omitted).  In other words, even if no official is held personally liable, municipal liability can still attach.  *See id.* at 486.  Thus, the fact that the Court dismissed the claims against the individual defendants does not preclude a finding of municipal liability if the County violated May's rights.

Dismissal of the claims asserting the County had an unconstitutional well-being check custom also does not preclude Morrison's failure to train claim.  The Court dismissed these claims in Counts III and IV because the record did not support a finding that the County was deliberately indifferent to unconstitutional conduct or authorized such conduct after having notice of it.  *Morrison*, 2021 WL 2228093, at *6–7.  The Court also held that was no violation of the right to adequate medical care and any right to well-being checks under the circumstances of May's death was not clearly established, so no reasonable jury could find for Morrison on these claims.  *Id.*

The failure to train claim sounds, however, in a different set of rights and practices than the custom Morrison alleged in Counts III and IV.  As the Court explained, inmates in general have a right to adequate medical care and protection from certain general harms.

-20-

*Id.* at *7.  The well-being check policy was meant to vindicate these rights and to prevent the harms protected by them.  A failure to properly train staff to adequately carry out that policy could jeopardize these rights.  In sum, although the County's well-being check policy itself may have been sufficient to protect these rights—or at least to provide immunity from suit because it did not evince a deliberate indifference or tacit authorization of unconstitutional conduct—the County's alleged failure to properly train staff on this policy may still have violated inmates' rights.  Therefore, dismissal of the due process claims does not require dismissal of the failure to train claim.

In sum, neither the testimony of Dr. Chernobelsky nor the prior dismissal of Counts I through IV warrant granting summary judgment in Defendants' favor on Morrison's failure to train claim, and the Court will deny Defendants' Motion as to Count V.

### 2.    Negligence Claims

In Counts VI and VII, Morrison claims that all Defendants were negligent and their negligence resulted in May's death.  Morrison contends the COs failed to exercise their duty of reasonable care when conducting well-being checks.  Morrison contends the County and Sheriff failed to exercise their duty of reasonable care in training and supervising staff charged with conducting well-being checks.

Under Minnesota law to establish negligence, a plaintiff must demonstrate: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the

breach of the duty of care was a proximate cause of the injury." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011).

"[A] defendant's duty to a plaintiff is a threshold question because in the absence of a legal duty, the negligence claim fails." *Id.* (quotation omitted). The existence of a duty is a question of law for the Court to resolve. *See id.*; *Carlson v. Mut. Serv. Ins.*, 494 N.W.2d 885, 887 (Minn. 1993). There is generally no legal duty to act for the protection of another. *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792 (Minn. 1995). The existence of a duty instead depends on the relationship between the parties and foreseeability of the risk. *Id.* A duty to act can arise when a special relationship existed between the defendant and the person harmed. *Harper v. Herman*, 499 N.W.2d 472, 474 (Minn. 1993). A jailor-inmate relationship is one such special relationship. *Sandborg v. Blue Earth Cnty.*, 615 N.W.2d 61, 63–64 (Minn. 2000). This special relationship, however, only imposes a legal duty to protect from a harm if the risk of harm is "reasonably foreseeable." *Id.*

Jailors have a generalized duty to protect inmates from certain risks. *See, e.g.*, *id.* at 64 (suicide); *Cooney v. Hooks*, 535 N.W.2d 609, 611 (Minn. 1995) (assaults by other inmates). Jailors, however, are not held strictly liable for all dangers to inmates, even those for which the jailor has a generalized duty to prevent. *See Sandborg*, 615 N.W.2d at 65; *Cooney*, 535 N.W.2d at 611. Instead, the risk of harm must be reasonably foreseeable either on an individualized or general basis. *See Hott*, 260 F.3d at 908–09;

-22-

*Cooney*, 535 N.W.2d at 611–12.   It is undisputed that May's cardiac arrest was unforeseeable and therefore Defendants did not have an individualized special duty to protect May in particular from a risk of death from cardiac arrest.

The Minnesota Supreme Court has not directly addressed whether death from cardiac arrest caused by a latent heart defect is reasonably foreseeable in the prison setting thereby triggering a generalized duty.[12]  Based on the inability to detect or predict such defects or cardiac arrests, the reasoning in *Sandborg* and *Cooney*, and the Minnesota Supreme Court's refusal to embrace strict liability even for reasonably foreseeable dangers heightened in prisons, the Court concludes that a death by cardiac arrest triggered by a latent heart defect is not reasonably foreseeable and therefore does not trigger a generalized duty for jailors under Minnesota negligence law.  The Court predicts the Minnesota Supreme Court would hold the same.  Because May's cardiac arrest was not reasonably foreseeable, Defendants had no generalized duty to protect him from its harm under Minnesota negligence law.  Therefore, the Court will grant Defendants' Motion as to Counts VI and VII.

---

[12] In resolving substantive issues of Minnesota state law, federal courts are bound by decisions of the Minnesota Supreme Court. *Integrity Floorcovering, Inc. v. Broan-Nuton, LLC*, 521 F.3d 914, 917 (8th Cir. 2008).  When a state supreme court has not directly addressed a question before the district court, the Court must attempt to predict how the state supreme court would decide and "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data." *Id.* (quotation omitted).

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Defendants' Motion to Exclude Expert Testimony [Docket No. 69] is **DENIED**;

   and

2. Defendants' Second Motion for Summary Judgment [Docket No. 74] is

   **GRANTED in part** and **DENIED in part** as follows:

   a. The Motion is **GRANTED** with respect to all claims against Defendants

      Andrew Richards, Saul Garza, Adam Olson, and Katherine O'Bryan;

   b. The Motion is **DENIED** with respect to Count V against Beltrami County

      and Sheriff Hodapp in his official capacity; and

   c. Counts VI and VII are **DISMISSED with prejudice**.

DATED:  July 5, 2022
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court

-24-